# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

D.B.,

        Plaintiff,

v.                                    Case No:   6:13-cv-434-Orl-31DAB

ORANGE COUNTY, FLORIDA,

        Defendant.

_____

## ORDER

This matter comes before the Court without a hearing on the Motion for Summary Judgment (Doc. 57) filed by the Defendant, Orange County, Florida (henceforth, the "County"), the response in opposition (Doc. 64) filed by the Plaintiff, D.B.,[1] and the reply (Doc. 70) filed by the County.

## I.    Background

Except where noted, the following information is undisputed, at least for purposes of resolving the instant motion.   D.B. is a transgender, male to female, who was diagnosed as a teen with what is now known as gender dysphoria – a psychological disorder resulting from the "disjunction between sexual identity and sexual organs."   *See Brown v. Zavaras*, 63 F.3d 967, 969 (10th Cir. 1995) (collecting cases that address gender dysphoria).   D.B. has undergone a number of procedures as a result of the gender dysphonia, including breast and cheek augmentation,

---

[1] As the victim of a sexual assault, the Plaintiff will be referred to in this opinion only by initials.

removal of the scrotum, and hormone therapy.   (Doc. 64 at 3).   As D.B. presents to the world as

female, the Court will utilize feminine pronouns to refer to her throughout this opinion.

On or about April 23, 2008, D.B. was incarcerated in the Orange County Jail.   (Doc. 57 at

2).   It appears that D.B. was detained awaiting trial, rather than as the result of a conviction, but

the parties are not clear on this point.   D.B. was initially housed in the jail's medical unit due to

dog bites suffered during her arrest.   At some point D.B was transferred from the medical unit to

a cell in the "Horizon Facility".   According to the Internal Affairs investigation conducted after

the events at issue in this case, the Horizon Facility shares some similarities with the jail's Main

Facility, in that it houses inmates at a similar custody level as the Main Facility; however, the

"operational and physical design [of the Horizon Facility] allows officers personal interaction with

inmates housed in [Horizon Facility] units, thus minimizing major incidents and enhancing the

officer's ability to quickly detect and defuse potential problems."   (Doc. 53-1 at 76).

On June 7, 2008, D.B. was scheduled to be moved from one cell to another within the

Horizon Facility, but refused to relocate.[2] (Doc. 53-1 at 73).   D.B. received a disciplinary report

due to the attempted refusal, and was moved into the new cell anyway.   (Doc. 53-1 at 73).

On September 4, 2008, D.B. was found to be in possession of contraband; as a result, she

received another disciplinary report and was transferred into the Main Facility (also referred to as

"general population") pending the outcome of a disciplinary hearing.   (Doc. 53-1 at 73).   Shortly

after the transfer, D.B. notified a guard supervisor, Sgt. Patricia VanBroekhoven (henceforth,

"VanBroekhoven"), that she was afraid to go into general population because of her transgender

---

[2]   The record does not reflect the reason D.B. sought to avoid this transfer.

status.   (Doc. 53-1 at 73).   VanBroekhoven placed D.B. in protective custody in an area known as "Pod E," pending an investigation into whether protective custody was warranted.[3]

At the time, such investigations were conducted by John Davis ("Davis"), an Inmate Affairs officer who was responsible for making a recommendation to a higher-ranking officer as to whether protective custody was warranted.   The higher-ranking officer would then approve or deny the request for protective custody.

After conducting an investigation on September 5, 2008, Davis made a recommendation to Captain Thomas Hungerford ("Hungerford") that D.B.'s request be denied.   Davis told Hungerford that he thought D.B. was not genuinely in fear but was instead trying to avoid disciplinary confinement.[4]   (Doc. 50-2 at 16).   Davis also noted that, although D.B. told him that she did not feel safe in general population, she had resided in the Horizon Facility for approximately three months without incident.   (Doc. 53-1 at 74).   Hungerford followed D.B's recommendation and denied the request for protective custody.

On October 10, 2008, after finishing a stint in disciplinary confinement in an area known as "Pod D," D.B. was transferred into general population.   Less than an hour after that transfer, D.B. again requested to be placed in protective custody, telling the guards, in Davis's words, that "inmates were shaking their penises at [her]" and saying that they "wanted to have intercourse with [her]".   (Doc. 50-2 at 15).   D.B. was transferred into protective custody pending the investigation into her request.   After interviewing D.B., Davis again recommended denial pointing out, among other things, that D.B. had resided in the Horizon Facility for approximately

___

[3] Inmates in protective custody cells are housed alone.   (Doc. 54-2 at 13).

[4] In contrast with those inmates in protective confinement, who are generally housed alone, inmates in disciplinary confinement generally share a cell with at least one other inmate, and sometimes more than one.   (Doc. 54-2 at 13).

three months without incident.[5]   (Doc. 53-1 at 74).   Hungerford again followed the recommendation and denied the request.   (Doc. 55-2 at 5).   D.B. was transferred out of protective custody and into a cell in the Horizon Facility.   (Doc. 53-1 at 74).

On November 18, 2008, D.B. again refused to be relocated to a different cell within the Horizon Facility.   (Doc. 53-1 at 75).   D.B. received another disciplinary report and was transferred into Pod D, pending a disciplinary hearing.   (Doc. 53-1 at 75).   On November 26, 2008, D.B. again sought protective custody, informing the guards that she feared being sexually assaulted if she remained in general population.   (Doc. 53-1 at 75).   VanBroekhoven moved D.B. into protective custody pending an investigation into whether protective custody was warranted. (Doc. 53-1 at 75).   Davis testified that he did not receive the proper paperwork to initiate a protective custody investigation.   In the absence of that paperwork, and based at least in part on the two previous denials, Davis had D.B. transferred out of protective custody on December 3, 2008 without conducting an investigation.   (Doc. 53-1 at 75).

D.B. was transferred into Pod D.   On December 8, 2008, she was transferred into a new cell in Pod D, one that she shared with an inmate named Josh Bailey ("Bailey").   On December 8, 2009, Bailey sexually assaulted D.B.   (Doc. 53-1 at 75).   After the attack, D.B. notified the guards, and after receiving medical treatment she was transferred into protective custody for the remainder of her time at the Orange County Jail.   (Doc. 56-3 at 11).

Bailey was convicted of sexual battery for the attack on D.B. and received a 25-year sentence.   (Doc. 64-1).   A subsequent review by the County determined that Davis had not conducted a thorough inquiry into D.B.'s requests for protective custody and Hungerford's

---

[5] At his deposition, Davis said he did not believe D.B.'s statements about the other inmates' conduct because he had caught her lying in the past.   (Doc. 50-2 at 17).

decisions to deny those requests were not supported by objective facts and were not impartial. (Doc. 57 at 16).

On December 7, 2012, D.B. filed the instant suit against Orange County, Bailey, and 13 "John Doe" defendants, seeking to hold them responsible for the assault.[6]   (Doc. 1-1 at 3).   As to the County, D.B. has asserted a claim under 42 U.S.C. §1983 and a state law negligence claim. By way of the instant motion, Orange County seeks summary judgment as to the Section 1983 claim, only.

## II.   Legal Standards

### A.   Summary Judgment

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact.   Fed.R.Civ.P. 56(c).   Which facts are material depends on the substantive law applicable to the case.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).   The moving party bears the burden of showing that no genuine issue of material fact exists.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).   In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to

---

[6] D.B. subsequently attempted to substitute Davis in for one of the John Doe defendants, but the statute of limitations had run.   (Doc. 38).

interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553.   Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial.   *Id.*   The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party.   *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.   The Court is not, however, required to accept all of the non-movant's factual characterizations and legal arguments.   *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir 1994).

### B.    Section 1983 and Deliberate Indifference

Section 1983 provides in pertinent part:

> Every person, who under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. §1983.   Municipalities are considered "persons" that may be subject to a Section 1983 claim.   *Monell v. Dept. of Soc. Svc. Of New York*, 436 U.S. 658 (1978).

The Eighth Amendment, which applies to states via the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishment.   *Hamm v. DeKalb County*, 774 F.2d 1567, 1571 (11th Cir. 1985).   Under this provision, conditions of confinement may make intolerable an

otherwise constitutional term of imprisonment.   *Id*., citing *Ingraham v. Wright*, 430 U.S. 651, 669

n. 38 (1977).

States violate the Eighth Amendment if they are deliberately indifferent to a prisoner's

serious medical needs or if they fail to provide prisoners with reasonably adequate food, clothing,

shelter, and sanitation.[7]   *Id.* (citations omitted).   The Eighth Amendment also obligates jailers to

"take reasonable measures to guarantee the safety of the inmates."   *Farmer v. Brennan*, 511 U.S.

825, 832 (1994) (citations omitted).   To survive summary judgment in a case alleging deliberate

indifference, a plaintiff must produce sufficient evidence of (1) a substantial risk of serious harm;

(2) the defendant's deliberate indifference to that risk; and (3) causation.   *Carter v. Galloway*, 352

F.3d 1346, 1349 (11th Cir. 2003) (per curiam).   Deliberate indifference has both a subjective and

an objective component:

> We hold … that a prison official cannot be found liable under the
> Eighth Amendment for denying an inmate humane conditions of
> confinement unless the official knows of and disregards an
> excessive risk to inmate health and safety; the official must both be
> aware of facts from which the inference could be drawn that a
> substantial risk of serious harm exists, and he must also draw the
> inference. …   The Eighth Amendment does not outlaw cruel and
> unusual "conditions"; it outlaws cruel and unusual "punishments".
> …   [A]n official's failure to alleviate a significant risk that he
> should have perceived but did not, while no cause for
> commendation, cannot under our cases be condemned as the
> infliction of punishment.

*Farmer*, 511 U.S. at 837-38.

---

[7] While the Eighth Amendment only applies to confinement that occurs after and as a
result of a conviction, the United States Court of Appeals for the Eleventh Circuit has held that the
due process clause of the Fourteenth Amendment provides the same minimum thresholds as to the
conditions of confinement of pretrial detainees, and – at least with respect to the basic necessities
of life – the Fourteenth Amendment rights of detainees may be defined by reference to the Eighth
Amendment rights of convicted inmates.   *Id.* at 1572-74.   As the standards are the same, for
simplicity's sake, the remainder of this opinion will only refer to the Eighth Amendment, despite
D.B.'s (apparent) status as a pre-trial detainee.

A municipality can be found liable under Section 1983 only where the municipality itself causes the Constitutional violation at issue; *respondeat superior* or vicarious liability will not attach under Section 1983.  *Monell*, 436 U.S. at 694-95 (1978).  To impose Section 1983 liability on a municipality, a plaintiff must demonstrate (1) that her constitutional rights have been violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation.  *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

**III.    Analysis**

   **A.    Excessive Risk**

To prevail on her Section 1983 claim, D.B. must show that Orange County knew that transgender inmates faced an excessive risk of sexual assaults from other inmates but disregarded that risk, failing to take reasonable steps to prevent such assaults, and that this failure caused the assault that she suffered.  Orange County first argues that transgender inmates did not face an excessive risk of sexual assault.  In support of this argument, Orange County points out that some of the corrections officers deposed for this case agreed with D.B. that transgender inmates were at greater risk of assault, but others disagreed or testified that transgender inmates faced varying degrees of risk, just as the rest of the jail population did.  (Doc. 57 at 16).  The County asserts that this shows that the risk of harm faced by D.B. did not rise to the levels found to be excessive or substantial in other cases, such as *Hale v. Tallapoosa County*, 50 F.3d 1579 (11th Cir. 1995) and *Marsh v. Butler County*, 268 F.3d 1014 (11th Cir. 2001) (*en banc*), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  (Doc. 57 at 16).

Even if one assumes that the corrections officers' testimony compels such a conclusion, their testimony is not the entirety of the evidence regarding the risk of assault faced by transgender

inmates.   Among other things, the Plaintiff has produced expert testimony from Valerie Jenness, a sociologist and criminologist who has studied prison violence, that transgender inmates face thirteen times the risk of sexual assault as that faced by other inmates.   Viewing the evidence in the light most favorable to D.B., the Court cannot conclude that transgender inmates face no greater risk of sexual assault than other inmates or that the risk of assault they face is less than found to exist in *Hale* or *Marsh*.

### B.    Deliberate Indifference

At the time of the assault on D.B., determinations regarding protective custody were governed by Orange County Corrections Department Administrative Order IO. 300, titled "Special Management Confinement".   (Doc. 51-7 at 16).   In pertinent part, that order provided that an inmate would be admitted to protective custody[8] "when there is documentation that protective custody is warranted and no reasonable alternatives exist."   (Doc. 51-7 at 25).   Except where a supervisor could make an immediate determination that protective custody was warranted, all inmate requests for protective custody were to be "forwarded to the [Inmate Affairs Section] for investigation" and were to be approved or disapproved within 72 hours.   (Doc. 51-7 at 26-27). The order did not specify any criteria (such as, for example, transgender status) that were to be investigated or considered in making the determination as to whether protective custody was warranted.

The County argues that there is no evidence to support a finding that, at the time of the assault on D.B., it knew transgender inmates faced a higher risk of sexual assault than other inmates.   Moreover, the County argues, even assuming that it had such knowledge, there is no

---

[8] Protective custody was defined in I.O. 300 as "[s]eparation from the general population for inmates requiring protection from other inmates."   (Doc. 51-7 at 19).

evidence that it disregarded that risk, in that it had put in place policies such as Administrative

Order I.O. 300 to address the risk of sexual assault in the jail.   Among other things, the County

contends that there is no evidence of other sexual assaults against transgender inmates at the

Orange County Jail, which would have put the County on notice that it needed to take additional

measures to reduce the risk they faced.   To be deliberately indifferent, a defendant must both be

aware of facts from which the inference could be drawn that substantial risk of serious harm

exists, and he must also draw that inference.   *Purcell v. Toombs County, Ga.*, 400 f.3d 1313, 1319

(11th Cir. 2005).

In response, D.B. argues that Orange County "had an alleged rape … involving the same

issues and the same parties."   (Doc. 64 at 15).   D.B. is referring to allegations in *Knight v.*

*Orange County*, Case No. 6:11-cv-1813-GAP-KRS (M.D.Fla. 2012), which was filed on

November 15, 2011.   In his initial complaint, Knight, proceeding *pro se,* alleged that he was

raped on September 13, 2008 by three other inmates after a state court judge improperly rescinded

an order requiring him to be held in protective custody and after Davis and other guards informed

the inmates in general population that Knight was a "snitch" and could be assaulted and raped

without punishment.   (Doc. 1 in Case No. 6:11-cv-1813 at 8).   It does not appear that any

defendant was ever served with a copy of Knight's complaint.   Two months after it was filed, the

case was dismissed for failure to prosecute.   (Doc. 11 in Case No. 6:11-cv-1813).

Aside from the fact that Knight also made allegations involving Davis, there is nothing in

the *Knight* case that aids D.B. here.   For one thing, aside from Knight's allegations in this 2011

suit, there is no evidence that the rape actually occurred or that, if it did, that the County was made

aware of it prior to the December 2008 attack on D.B.   Moreover, Knight did not argue that he

was entitled to protective custody because of transgender status, but rather because he was "a

former bail bondsman and informant for the Secret Service, F.B.I., Orange County Sheriff and a

State witness."   (Doc. 1 in Case No. 6:11-cv-1813 at 8).   In addition, Knight did not allege that

the protective custody policy was insufficient; rather, he alleged that the guards *encouraged* the

other inmates to attack him.   Even assuming *arguendo* that Knight was raped, knowledge of that

attack would not have put the County on notice that its protective custody policy was insufficient

to protect transgender inmates such as D.B.

Aside from the *Knight* case, the only evidence that D.B. points to on this point is

deposition testimony from Annette Coleman, an investigator with Inmate Affairs who had worked

for Orange County Corrections since 1987.   (Doc. 51-1 at 4).   In the course of discussing the

Prison Rape Elimination Act, 42 U.S.C. § 147 (the "PREA"), the following exchange occurred

between Coleman and D.B.'s attorney, Jeremy Markman:

> Markman:    What I'm asking you about is the fact that [the
> PREA] was in place since 2003, the fact that Orange
> County has had transgender inmates since they
> opened, true?
>
> Coleman:    Yes.
>
> Markman:    Since you've worked there, right?
>
> Coleman:    Yes.
>
> Markman:    And there have been prior incidents of assaults and
> sexual batteries and everything else that you can
> imagine against transgender inmates, true?
>
> Coleman:    True.

(Doc. 51-4 at 21).   The transcript includes no further discussion of these incidents.   This

exchange is far too vague to support a finding that at the time D.B. was attacked Orange County

knew that its policies, such as Administrative Order I.O. 300, were insufficient to address the risk

of sexual assault faced by transgender inmates.

D.B. has failed to produce evidence from which a reasonable factfinder could determine that Orange County was deliberately indifferent to the risk of sexual assault faced by transgender inmates.[9]   Accordingly, the County is entitled to summary judgment as to D.B.'s Section 1983 claim.

In consideration of the foregoing, it is hereby

**ORDERED** that the Motion for Summary Judgment (Doc. 57) filed by the Defendant, Orange County, Florida is **GRANTED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on September 18, 2014.

**GREGORY A. PRESNELL**
**UNITED STATES DISTRICT JUDGE**

Copies furnished to:

Counsel of Record
Unrepresented Party

---

[9]  This conclusion renders moot the separate issue of whether the County's policy caused her to suffer a deprivation of her constitutional rights, and thus this opinion will not address it.